I turn that sound of it works. A little high because we were getting the first we were getting feedback, but I think it's right. Yeah, yeah. Maybe it was like that over here, but All right, you're ready when you are, Mr Swain. Good afternoon, Your Honors. We may please report Frederick Swain will have the appellants to our River Service Lake Navigator Insurance Company. This case is about a 200-foot SCF Marine barge partially sinking Railroad Service Lake Province Terminal where it was delivered for loading. The sinking was undisputedly the result of a one-foot narrow fracture in the bow rake knuckle on the underside of the barge. The fracture is difficult to see based on the general conditions of the barge. So we've circled the area in question on a photograph on page 38 of our original brief. It looks a bit like a lip bent slightly inward. Upon delivery, the barge empty would have sat, the fracture would have sat about 10 feet above the waterline. Once loaded, you can actually industry practice, which is front to back. You don't load on opposite sides because of fracturing of the actual entire barge, and I don't think that's a dispute in this case. Once it was loaded on the front, the barge dipped and that ultimately that barge sunk. How long did the barge sit where it is at its ultimate destination before the rice was loaded? Two days? The barge, Your Honor, I don't remember the exact amount of time. It was two to three days on my count. I think it was a few days, yes, but again, Your Honor, the entire time that fracture would have been 10 feet above the waterline. I understand. I'm just trying to get the time limit. Yes, Your Honor. So it's riding high in the water then? It's riding high in the water, and what's really important here, Your Honor, is that this is a movement off of a city river going up. So it doesn't get affected by the current. That's why this area is designated as a calm water area. Well, the suggestion is that I guess that when you loaded the rice, it was already there. Once it took the load down, as it intended to do, it came down to, the water level came up to, the leak became effective. That's exactly right, Your Honor. Yeah. So how does, if it's sitting still for two days there waiting, being loaded, the, I know people inspecting the outside, and it's got this large gash I saw a picture of. I'm trying to figure out what, I'm trying to figure out how this happened. Well, Your Honor, the only inspection that was done formally from the vessel was dropped off by the deckhand, and he explained very specifically in the declaration and deposition testimony that this former employee, the policies and the procedures were moving to walk the deck and give a visual inspection of it. He's not allowed to go into the hold, to void compartments because of oxygen issues, dangers, U.S. Coast Guard confined spacing restrictions. So he says, after this incident occurred, it came in unloaded and then was loaded, and when it was loaded, within the course of the day, it went down. Yes, Your Honor. Okay. And so I would ask that if you look at that picture, you can see that this is on the rake underneath the portion of the barge in the knuckle of it, and you can't even see it with a picture directly looking forward. You can take 10 people and say, what do you see? They wouldn't see it. So you circle the actual area because it's just a lit in, and his, the deckhand is adamant that there's no way he saw this after, and he testified that there's no way he could have possibly seen this at the time that first raid inspection monitor was still in the Mississippi River waiting for the barge to come in. The next point, though, Your Honor, is that all parties agree that the fracture was caused by a green object that left markings around the fracture in the rake knuckle. And there's a photograph of that at ROA 855, but the evidence establishes that the barge did not come into contact with any such object while at the terminal. In fact, the only greenish object located at the terminal was a barge that was in a fleet in a totally different spot from where the barge was the entirety of the time it was in the terminal, and the records indicate that those objects never could have possibly come in contact with each other. To suggest they somehow spontaneously met is pure speculation, and that is what the appellees have done. Well, it's not pure speculation, Counselor. I mean, they had this inspection SCF did before they turned it over where the fellow went down in into the barge and saw no sunlight, saw a little bit of water, but he said it wasn't enough water for a concern. I mean, getting close to two inches would have been a concern, but a quarter inch not. So you have this inspection that SCF did before they turned the thing over. So that seems to be more than speculation. It was in good shape when they turned it over, right? I respectfully respond to that, and that SCF has admitted that it has no idea what the condition of that barge was when it was delivered. It hadn't seen that barge in forever, and the naked owner of Bethel Holdings hadn't seen it since delivery. Well, while it was in Daryl, five days before it was delivered to the facility, it was, there's a cleaning service called C&M in Daryl, and they would move the barges and walk to deck and they'll poke their head in the holes, but they don't necessarily go in the holes either. I thought they did. No, and they're just there to inspect for cleaning purposes. But the important point there, Judge Wilson, is that the only evidence that the appellees have offered in this case is from the corporate representative who just basically said what should or shouldn't happen. He did not train the individual that did it. He never spoke to the individual who did it. He doesn't know what the individual that did it actually did or didn't do. And also to suggest that they had some incentive to find the fracture or damage, because then they might get the business. Again, under motion of consumer redundancy, that's just pure speculation. Counselor, help me a little bit about the, to visualize this. When was the handoff, if you will, I would just, as a tug, your client picked it up and at some point and then took it into their harbor. So how did that happen? Where did it happen? Yes, Your Honor. Well, it actually starts from where Judge Wilson just left off. It was cleaned down there on May 2nd, and they took a 300-mile journey up the river with another tow, with a bunch of barges in his fleet, possibly green, possibly not having switched out the entire time. On the fifth day, it was delivered to the facility just outside. And what happens is there's a fleet boat that comes out and meets it in the Mississippi. They walk around the section on the barge, happens there, and then the corral harbor boat brings the barge in. And in this instance, it brought it directly to the loading berth. And at some point, it just pushed a little forward to the next loading berth. Never went in any fleet in the facility. In the green barge, if there's anything to be in contact with in the facility, never came out of the fleet, which was in a totally different area while it was at the facility. And again, I think, Your Honor, it's not genuinely disputed that a green object was it, whether it was a kevel, a barge, or anything else. And we have expert testimony from an engineer, from mental urgers, from every single witness with direct evidence. Every single witness, detectives, captains, superintendents, supervisors, anybody with direct evidence will say, and I've said in this case, it would have set a trial, that there's no way that that could have happened that way in our fleet. And that's why, even under bailment theory, Your Honor, we have satisfied the burden. We don't think the appellees can show that they dropped it off in good condition because their corporate representatives have said they have no idea what the condition was at the time. They couldn't specify. But do they have to show that? I mean, it doesn't tell bear the burden? So, Dick Wilson, if the appellees can show that they delivered in good condition and got it back in a poor condition or some damage condition, then the burden would shift over to the bailee to show, well, I'll be specific. It's Richmond Sand versus gravel fork. It's the bailment presumptions. It says specifically, the bailment presumptions do not pass upon the bailee the ultimate burden of proving how the damage occurred. It's a rebuttable presumption and it shifts to the bailee purely for purposes of proceeding with the evidence. All they have to do to rebut it is show how the damage occurred and that they weren't negligent. We've done that. We have shown how that occurred. We haven't shown when and where because it could have been three years before. But that's, well, that's if they were suing you, right, in terms of the normal flow of things and the burden of proof. I mean, you're suing them and it seems to me that you would have to show the when and the where. I mean, those are the questions that decide the case, right? Well, Your Honor, I respectfully suggest that this is still a bailment issue. But even if we had the burden of the findings of evidence, we're still feeling that there's no way it could have happened in our custody. Think about it this way, Your Honor. If this had happened three years before and this is the first time we've ever seen this large, how in the world could the bailee be responsible to say exactly when and where it occurred? We didn't have custody of it. We have no idea where it's been. We have no idea who's doing what with it. And for that matter, neither do the appellants. It's all charted to some other people and some other entities. Where is the evidence that shows that this didn't happen under Carroll's watch? Well, all of the records that have been produced as far as its time at the facility, all of the deck logs of the fleet boat, the transfers of any barges or anything else, the fleet records of the green barge being the fleet not coming out in this barge, not leaving the loading areas, the fact that the expert metallurgist and engineer in this case. Now, wait a minute. The district court excluded the expert. No. Yes, Your Honor. Well, he limited, he limited the expert engineer and metallurgist only to the extent that he, that he couldn't say, couldn't repeat a fact that was known in the case because he said in his report that it was a calm area, which wasn't even disputed. But the district judge says, you can't say that. You're the expert. That can be, that can be excluded the witness from testifying. As to the witness markings and the cause of the incident, he was going to testify on that at trial. So the witness marks and the cause of the incident, again, yeah, something ran into the barge, but the question that Carroll bore was where in the wind. If the barge was delivered to Carroll and it was in good condition and the damage happened in Carroll's possession, Carroll's claims fail, right? Well, but I think that we've established that it wasn't delivered in good condition because that could not have happened in our facility. And again, I just, we believe that it's, it's basically, I think it's a western district of Pennsylvania case that suggests that situation. But the problem in that case is they said, what we seem to be saying is that we proved the negative. It couldn't have happened with us. Therefore, it mustn't have happened with them. Is that enough? Yes, Your Honor, because it doesn't matter whether it's a maritime debit claim on a duty risk. It doesn't matter whether it's on sewers claim or strict liability theory. It doesn't matter whether it's a bailment issue with the preponderance of evidence issue. In every single respect, we have, we have unreported evidence, the only direct evidence in the case to fully explain that it could not have happened in our facility. And therefore the burden is, is on the appellees in that respect. I mean, they have a duty to deliver  But we do not look for the things that could make a vessel unseaworthy, ultimately, if it's a latent defect. In this situation, this is essentially a latent defect. It's something that wouldn't be observable by the average crew member walking the deck of the vessel. And if you look at the picture, I think you'll agree. I mean, you can't even, again, if you took pictures, the panel on the actual clue is telling where the structure is, looking at it up close, you might not see it. You wouldn't see it without the circle underneath it, or you would think it was another area. The barge was not And again, there's just no evidence whatsoever to suggest it happened in our facility. And it gets back to the primary point here that there were so many genuine facts of dispute in this case. I mean, you literally filed a 12-page to test the issues of fact, in connect with our motion in opposition. The district judge didn't give any weight to that, that we're aware of, and he certainly didn't give any weight to all of the evidence that said it could not have happened within the facility. And to be clear again, the next thing is not excluded from testifying as to that point, and he would have been the only engineering metallurgist to testify as to that point. But I don't really think it matters because their surveyor doesn't disagree. I mean, everybody thinks it was something green that caused it, and it could not have happened within our fleet. And the absence of evidence from the 300-mile journey to our facility, you know, it speaks volumes. And the fact, again, that the CNM report that the district judge referenced in his opinion, no direct evidence of what actually occurred there. I mean, it's pure speculation from a corporate rep, who's a business associate of the appellees, who said, this is probably how we do it, so it should be done. He may have gone in the void, he may not have gone in the void. Also with Mr. Pemberton, we don't dispute or run from the fact that he did fill out a form report after he walked the deck in this case, and he did check every box along there, but he is adamant in his testimony that there's no way he would have seen the fracture. He would have had to go down in the tank, which he could not have done under policies and procedures. And he did witness the fracture after it was raised, and he did testify very specific to that. And the court, this was literally, Your Honors, on, I think it was three business days before trial, with the motion that had been pending for four months. We had gone through the pretrial conference, the pretrial logistics conference. We had gone through all the witness preparation. So what difference does that make? I understood you put that in your brief, but I guess you're just suggesting that this court didn't consider it properly. I'm not sure where that argument takes you. The argument you're making, I'm not sure where it takes you. You made it in your brief, but the timing of the district court had it, and all of a sudden it ruled against you. Your Honor, this is just, well, in our opinion, it was a complicated issue. In our opinion, it was a summary judgment issue with a lot of different facts. And so we think that just under the straight review of all of the different standard summary judgment cases that we cited, that it's Well, okay, I'll take that. But I've not found much out there in terms of presumption of controlling law, but there is an almost identical fact situation in Dunkerque. The court deals with the fact pattern that's right on forge with us on shifting the burden of proof. And the court district court said in the somewhat unusual situation of a barge loader suing the barge owner for the sinking of the owner's barge, it's the plaintiff's barge owner who bears the burden of proving. Your Honor, I would say that You just disagree with that? Not necessarily, Your Honor. It's more typical that it's the bailor suing the bailee for some damaged property while in the bailee's custody and control. That's not always the case. So it still happens the other way around, and the appellees have cited a number of cases where that actually did occur and where these issues were allowed to go forward. And I'll also say, though, just to be crystal clear on this point with the motion of the summary judgment standard, there's not one case that's been for benefit. It actually was decided on motion of summary judgment. Everyone was assigned a trial beyond the motion of summary judgment process because of the replete issues of genuine facts and dispute, as you can see here with the different testimony as to when this racket could or could not have occurred. All right, Mrs. Swing, you have a red light. You have been forthright in answering the court's questions. You've reserved your rebuttal time, so why don't we stop there and hear from Mr. Howard, and then you have the right to come back up. Yes, Your Honor. Thank you. May it please the Court. My name is Giles Howard. I represent Defendant Appellee SCF Marine, Inc. and Defendant Appellee Vessel Holding 7, LLC. I am here to discuss today why the district court's judgment in granting my client's motion for summary judgment on all the plaintiff's claims should be affirmed. This is true for three main reasons. First, the appellant's allegation that the SCF barge was unfit for its intended use at the time it was delivered to Terrell is an Second, appellants, as the plaintiffs in this matter, bear the burden of proving that the SCF barge was delivered to Terrell in a condition unfit for its intended use. Third, at the close of discovery, appellants have failed to make a showing sufficient to establish this essential element, namely that the SCF barge was delivered to Terrell in a condition unfit for its intended use. For these reasons, the appellant is asked that this court affirm the judgment of the district court and hold that the plaintiff bears the burden of proof in a civil action. Your Honor has asked several questions about the timeline underlying this case. On May 2nd, 2018, CNN Marine, a non-party not affiliated with my clients, conducted an inspection of this SCF barge. It is the business practice of CNN Marine to have its inspector enter the tanks of the barges that it inspects. CNN is not paid for the barge inspection. It's paid for the barge cleaning, but it is also a barge repair facility. And so Mr. Kevin Daniels of CNN testified that CNN does have an incentive to be thorough in its inspection. Let me ask you a question about that inspector. The person that's inspecting that, if he finds a problem, does his company do the repair? Your Honor, if he finds a problem, he notifies the barge owner and then seeks to do the repair. And because the barge is already at a barge repair facility, it is customary that that facility would do the repair. I'm just trying to identify his incentive to find problems. Because it wouldn't make much sense, Your Honor, for SCF to take a barge that's damaged, move it some hundreds of miles on the river to a different facility. So that's the incentive that CNN Marine, a non-party unaffiliated with my clients, has to do a thorough inspection. That barge was then inspected five days later on May 7, 2018 by Terrell's deckhand, Mr. Corey Pemberton, at the time that Terrell took custody and control of that barge. The inspection wasn't as detailed, I guess, as far as what Terrell did, right? In other words, the deckhand says there's no way I would have seen this damage. The inspection, Your Honor, is not as detailed as what CNN Marine did because the practice and procedure of CNN Marine is that the inspector fully enters the void tank of a raked barge. And of course, this fracture was in the port bow raked knuckle of this raked SCF barge. But importantly, the Terrell about the deck of the barge, he testified that he opened a hatch cover in the bow void tank and looked inside and he didn't see any light and he didn't see any water. Didn't he also say he wouldn't have seen this? Well, Your Honor, he said that after litigation had commenced. But he testified to it, right? He did, Your Honor, but importantly, he also testified that he did not see any water in that void tank and that he did not see any light in that void tank and that if he had seen light or water, those would be indicative of a fracture. And in that event, he would then seek the appropriate safety tools to fully enter that bow void tank because as CNN has an incentive to find flaws in barges, Terrell also has an incentive to be thorough in these inspections because it doesn't want to get blamed. Well, we wouldn't be here. I mean, they have an incentive probably not to be here today, right? Yeah, but he said he said he wouldn't have seen the fracture and so is that enough to create a material issue with that? No, Your Honor, I think what's important about Mr. Pemberton's testimony is that he testified that he did not see light when he looked in the bow void tank on May 7 when he conducted the documented inspection. And then he testified that after the barge was salvaged, after it had sunk and been raised, that he looked inside the void tank and he saw light because if there's a fracture in the hull of a barge surrounding that void tank, that fracture, if you look inside the void tank in daylight, that fracture would let daylight in. And so Mr. Pemberton did not see daylight in that void tank on May 7 and he inspected it during the day. He inspected it during the day. He did not see light in that void tank on May 7, but he did see light in that void tank after the barge was raised. But what about Counsel Officer's argument, if I can summarize it clearly, if not, he'll correct on rebuttal, that, well, they proved that it didn't happen when it was in their custody of care. There's no way it could have happened. I mean, is that enough to sustain their burden? No, Your Honor. An essential element of the plaintiff's causes of action in this case is that the barge was delivered to them unfit for its intended use, i.e., if it's fractured. They have to prove. But their argument is it was latent. Respectfully, Your Honor, they lean on the photo that they included in their brief, Your Honors, to suggest how hard it would be to see that fracture. But that photo was taken after the barge was raised. So that photo is not necessarily an accurate depiction of how it looked before it had sunk and been on the bottom of the river for several days. But I would respectfully suggest, Your Honors, that Terrell provides us the best proof that that fracture did not exist on May 7 because that inspection report that Mr. Pemberton created that appears on record in Appeal page 554, that report has a number of specific areas of the barge that the inspector is supposed to check for damage. And Terrell's 30E6 designates testify that the purpose of this inspection is in part to check for pre-existing damage. So there are some specific parts that the deckhand is supposed to look at, and that includes the wing tanks, the timber heads, the kebbles, and it also includes the knuckles. And there's a spot next to each of those specific items where the deckhand can check if you looked at them. And if you look at record page 554, Mr. Pemberton, when he completed this report, he checked next to knuckles. And there's a spot next to that check mark called remarks, where if a problem is noted in any of those specific parts of the barge, that the deckhand can then note the problem. And Terrell, for its 30E6 designate, specifically testified that that is the purpose of the remarks section, that if you see a problem with the barge, the deckhand is supposed to write down the problem under remarks. And so not only is the space next to knuckles on this barge inspection report checked, there is also nothing under the remarks section. All right, so he missed it. He missed it. But if it didn't happen under Terrell's watch, is that enough to defeat their claim? No, Your Honor, because that's not what they need to prove. But respectfully, I'd suggest that if someone right now, you know, if the shoe were on the other foot, someone was blaming Terrell and saying that the fracture existed at the time of delivery, you know, that they'd be leaning on this report to show that, no, they took in a barge in good condition. That's why baileys create these inspection reports. So there's no doubt about the condition of a barge at the time that the bailey takes custody and control of it. And I would suggest, Your Honors, that this barge inspection report is the only contemporaneous evidence of the condition of the barge on May 7 of 2018. And it was created by Terrell. It is the best evidence of that barge's condition, and it specifically requires the barge inspector to look at the knuckles. It indicates that the knuckles were checked. And that is the best evidence of this barge's condition on May 7, when Terrell took custody and control of it. And the essential element of their claims, all of them, the essential element is that the barge arrived and was provided to them in a damaged condition. That's what they need to prove, Your Honor, not to raise some sort of speculative doubt about whether it possibly could have occurred at their facility. Now, there are those green witness marks on that fracture, which respectfully we find obvious, the green paint marks along that fracture. And it is true that the testimony in this case is that it could have been caused by a green object. SCF's expert surveyors also argued that it could have been caused by an object where the paint had transferred to a non-green object. Because on the river, these barges touch things, okay? And it is conceivable on the river that green paint would have rubbed off onto a non-green object. Now, I'm not exactly as cut and dry on that point, but I don't think we need to get to it. Because what's important is that we have this inspection report from May 7. There's no photographs from May 7 or before. There's no videos from May 7 or before that show a fracture. There's no witness testimony from someone saying that they saw a fracture in that barge on or before May 7. Instead, we have this barge inspection report that is clear as can be that the knuckles were checked and there is no notation of damage to those knuckles. The barge has done everything it can throughout this case to distance itself from its own business record. But the business record exists and it's our only piece of contemporaneous evidence, and I would respectfully suggest that Mr. Pemberton's own testimony about not seeing light when he looked into that void tank on May 7 during the day and then seeing light after the barge was raised, I would suggest that further bolsters the accuracy of the inspection report that he did on May 7. Because if that fracture exists on May 7, you'd expect him to see light shine through it when he looked in those void tanks, the same as when he looked in those void tanks after the barge had been raised. I want to talk briefly, Your Honors, some questions were also raised about the burden of proof in this case. Mr. Swaim has addressed the question in terms of bailment law, but the opposing parties did not make a claim under bailment. They made a claim for general maritime negligence, for unseaworthiness, for salvage, for breach of warranty, indemnity and contribution. They did not make a claim under bailment, and as one of Your Honors pointed out, it is somewhat unusual the situation we find ourselves in where the bailee is suing the bailor. We've only found two cases where court has addressed that situation, but both those cases out of the Western District of Pennsylvania, Consolidation Coal Company v. U.S. Steel and Dunkard Mining Company v. Mon River Towing, both of those cases agree that in this somewhat unusual circumstances, it is the plaintiff bailee who bears the burden of proof on the allegations of unseaworthiness. The plaintiff bailee, that's what's important is the bailee's plaintiff, and opposing counsel also raised the case of Richmond Sanding Gravel, and we actually quoted that case in our brief, Your Honor. We directed the court's attention to that decision in which they said, quote, it is thus solely a procedural device and does not in any way affect the ultimate burden of proving the bailee's negligence, which burden remains throughout with the plaintiff bailor. Just to highlight that in that case, it was the usual case where the plaintiff was the plaintiff. That's why the burdens rested the way they did on the bailor in that case. But in this more unusual case, where the plaintiff is a bailee, the burden rests with the plaintiff to prove a vessel's unseaworthiness. Do you agree with counsel opposite's qualification about the exclusion of the expert testimony? No. Respectfully, Judge, I differ with opposing counsel on Mr. Bartlett, the metallurgist. Opposing counsel leaned heavily on Mr. Bartlett in trying to suggest that Terrell can prove that the damage didn't occur at its facility. And the district court's decision on Bartlett is important. The district court identified three areas of opinion that Mr. Bartlett was offering, and they're important enough, I think, to read them here. One was that the Terrell loading facility is located in a finger of water connected to the Mississippi River, which was protected from the current. And as a result, it is inherently less hazardous and therefore less likely for an elision or collision to occur than a berth exposed to the Mississippi River. Now, the district court struck that opinion because Mr. Bartlett agreed that he did not measure the current, and he would have needed to do that opinion to be Now, Mr. Bartlett also testified that the hull fracture more likely than not occurred at a pre-existing time before the barge arrived to Lake Providence area on May 7, 2018. And what we argued below was that that was just a gratuitous interpretation of the facts by the expert witness and that it is not the role of an expert witness to serve as a fact finder. That doesn't add value, and we sought to exclude it on that basis. And the court agreed with us on that opinion from his report was that considering the slack water in the lake at the Terrell facility and the lack of maneuvering required of the barge in order to bring it in and ultimately bring it to the port dock, the puncture and fracture would not be expected to have occurred while the barge was at the Terrell Lake Providence facility. And Mr. Bartlett also testified to his lack of navigational experience and expertise. He's not a towboat pilot. He's not a towboat captain. And so the court agreed with us that he couldn't testify to navigational subjects because he lacked that area of expertise as well. So what the only thing that the court allowed Mr. Bartlett to testify to, the only way in which our motion was denied, was that to the extent defendants object to the portions of Bartlett's report and testimony which rely on the witness remarks on the basis that he did not use reliable principles or methods, the motion is denied. I respectfully suggest that we struck more of Mr. Bartlett's opinions than opposing counsel has admitted to and they have focused on this line from one of his depositions about how he doesn't see a mechanism by which the damage could have occurred at Terrell's facility. But it's unclear what the basis is for that opinion. And to me it seems like it falls more within the report opinions that the court excluded in granting partially our Daubert motion as a gratuitous inference about the facts and something that Mr. Bartlett didn't have the requisite expertise to testify to. Counsel, let me shift gears slightly with you, please, sir. You filed a counterclaim which I take it was sort of implicit and it's instantly resolved by the court's order, but I'm not sure what the status of this is. The counterclaim, Your Honor, remains pending. My clients moved for summary judgment solely on plaintiff's claims against them on the basis that plaintiff had not, at the time of his discovery, introduced sufficient evidence on an essential element of their claim, i.e. that the barge was delivered in a fit condition. SCF did not move on its counterclaim. So that one is pending, Your Honor. Okay, so what's the status of it? It's just there? Well, after the court ruled on the summary judgment motion. It was a salvage claim, I'll say. Go ahead. I'm sorry. Well, Your Honor, after the court ruled on the summary judgment motion, opposing counsel indicated their intention to seek an interlocutory appeal and the court therefore stayed the trial. So following the resolution of this appeal, the counterclaim remains to be resolved at the district court. Well, I've always found that the A3 provisions of 28 U.S.C. 1292 to be a little, it's at the margins, a little elusive sometimes about interlocutory character, exception for laboralty and the way it's phrasing. I just want to be quite clear that we have no problems there. I didn't want to come sneaking in the last. Jurisdiction has a way of doing that sometimes. Your Honor, we did not attack jurisdiction in this matter, of course. I know you wouldn't. I know you certainly wouldn't. But the problem is that we have to assure that we do have it. And the statute is unique to Aberlty and intended to be, to tolerate the appeals. But the language of the rule itself is that it speaks in terms of resolution of claims. I just want to give you a heads up on that to be quite clear that we do come well within the compass of the statute. It appears to be that we do, but I have, I just want to be quite clear about that. Yes, Your Honor. We're familiar with that the contours of 1292A3 can be vague, and we understand that Your Honors must also be satisfied with your jurisdiction regardless of what the parties say. And of course, if Your Honors are not satisfied with your jurisdiction, I'm certainly not going to fight you on that. Well, it's quite clear if you're going to summary judgment, for example, you obtain a summary judgment, or you obtain a ruling of liability, for example, you can bring that up, sort of implicit bifurcation. Aberlty enjoys that wide door to the federal court. But then you had, here we had a couple of other claims that were back and forth. I thought your counterclaim was in essence implicit. It's sort of the response back the other direction, but be implicitly determined by the ruling of district order A. I like my chances, Your Honor, but it does remain as in below. I see that my time is about expired. We ask that Your Honors affirm it. If you have no further questions, I'll rest. All right. Thank you for your argument, and we'll now hear Mr. Swain on the vote. Thank you, Your Honors. Your Honors, we're only talking about the summary judgment standard here, and all of the direct evidence that's been offered and was going to be offered at trial by witnesses was purely on behalf of the appellants. The appellee had a surveyor that was never present for anything, even in connection with his surveyor who was going to testify. They have corporate reps who admitted in their depositions they had no clue what the condition of the barge was at the time, and yet the appellants had all of the captains, the deck hands, corporate representatives. They had their own surveyors who were there. They had their engineer who reviewed this and is the only engineer in the case, and so, you know, I would pose that the testimony of Corey Pemberton, if they're going to squarely rely on his report, is good enough to defeat summary judgment. As far as the CNN report, that was five days before, 300 miles away, and we don't even know what that individual did. That is absolutely speculation as far as that report. You know, again, Ms. Howard is a talented lawyer and represents clients well, but the appellee's arguments are flawed in that, again, they have no direct evidence regarding the cleaning report, and the report, in fact, does know water. We should create an issue in and of itself. They provided no evidence regarding the barge's journey to the delivery point, despite that being their contracting party. They can't meet the burden as to Mr. Pemberton because his attitude, he clearly says, I would not have seen that, and that's at least good enough to go to a trial, in our opinion. Counsel, I would say they excluded more than you owned up to in terms of weighting the residue of his report. He says that in and of itself, I'm not sure I could buy it. The basis that counsel explained as far as Bob Bartlett not having enough navigation experience to comment as an expert on navigation is accurate, but it doesn't change what I said before. He was limited on that issue of the calm water and how you wouldn't have that flow of the current vessels affecting things from a navigation standpoint, but the bottom line, Your Honor, is it's not disputed. None of it's disputed. The appellees actually cite in their motion, I think we put this in our brief, in another motion that the water was calm. They used it to their advantage. It's an inlet that just doesn't have the current of the river. So as to Mr. Bartlett, which is why we didn't challenge that opinion is because it was insignificant. There was factual, the court basically said there's facts that can testify to that. Fact witnesses, you can as an expert say that, you know, something that's potentially navigation, but they absolutely were going to allow him to testify to the witness marks, the green marks, but you know what, Your Honor, that's not disputed either. Their surveyor said that it was a green marks and it must have been a barge. No, in deposition, he tried to say, well, maybe it was a kevel, maybe it was something else. There's some green on them, but we can establish through all the direct testimony of witnesses that actually know the facility and were there, couldn't have happened in our facility. There's no way. And as far as any issue, just to quickly address this, Your Honor, as far as the briefing about potential waiver, a breach of warranty contract or salvage claims, there was absolutely no waiver in any respect. And we covered everything in our 12 page statement of contested facts in  Let me ask you this. Yes, Your Honor. In a 1-2-3 bullet point way, tell us what the summary judgment record consists of. Just 1-2-3-4-5-6-7-8. Look at the record through. I mean, just boom, boom, boom, boom. You mean the record as it's presented to this court? Yeah, I mean, it's up here on summary judgment. You're saying you should have got a trial. The other side says, nope, you had plenty of chance to satisfy your burden, but you didn't. So summary judgment there in charge of the loss. Just, you know, rat-a-tat-tat. We know about the expert report. We know about them. So what else? What else does the summary judgment record consist of? Your Honor, the summary judgment ruling focuses solely on the issue, and I quote it, specifically the court stated, to find a genuine issue of material factual. That wasn't my question. Tell me 1-2-3-4-5. What does the summary judgment record consist of? It consists of the, from the appellee's perspective, the CNN report, testimony from the CNN representative, the inspection report from Mr. Pemberton, Mr. Terrell, it is Mr. Pemberton's declaration and Mr. Pemberton's testimony. It is all of the captains that would have taken this barge in and out or would have moved anything else around within the facility. It is, or at least one captain or another was going to testify at that point that wasn't there at the time this was being loaded. It, I believe, may be another deckhand. It's the corporate reps and supervisors and superintendents for Terrell. It is the SCF representatives testifying that they didn't know what the condition of the barge was. It's all of the documents from the facility that show where the vessel was, where it went, what happened, what didn't happen, the load times, the load reports, the weighing of the rice. It includes expert opinions in it from surveyors and from, I believe, the metallurgists, testimony from those individuals. It includes the relevant information in the case, which we would represent is 100% as far as the direct evidence in support of the appellant's claim and only as far as individuals that don't have direct knowledge as to the appellee's claim. All right, so it sounds like the summary judgment record is pretty packed in terms of, you know, what's there. More so than a lot of summaries, I mean, just we don't have an issue about the exclusion of evidence other than the report, but I mean, it sounds like the summary judgment record is pretty full. So the question is, from your standpoint, you say that should have left back issues that got you in the trial. The other side says everything that could have been there was there and the judge decided that even taking the evidence in the light was favorable. You didn't meet your burden. You lose summary judgment. That seems like what it kind of boils down to, right? Correct, other than the fact that the opinion is limited to only a very small portion of our opinion of what we just talked about. And also, there were, I believe, 11 witnesses that would have testified on behalf of the appellants, all with direct knowledge or nine with direct knowledge that the judge never got to, the court never got a chance to hear from. Particularly, again, credibility issues from a motion of summary judgment standpoint from Mr. Pemberton, who specifically addresses the issues that they're relying on. And when they say, when the appellees say, well, the C&M, the C&M that you did is inevitable than that. Again, Your Honor, that's pure speculation. There's no evidence of it that was in the record. The one thing that's missing on the record to fix your question is that whoever performed the inspection at C&M never testified. No evidence offered from him. It was Mr. Pemberton. And then everything after Mr. Pemberton was, this could not have happened at the facility. All right. Okay. Well, that's helpful. I wanted to ask real quick. I know you're out of time, but if you could comment on Judge Higgins-Boppin, Higgins-Boppin's question about jurisdiction, do we have it? Yes, Your Honor. I know that we, I guess we didn't take a separate section of the report beyond just the jurisdictional statement, but my understanding is that we absolutely have jurisdiction, that the court absolutely has jurisdiction in this scenario. I appreciate that. That's my supposition, too, but I wanted to apply it to this record because you had some loose ends. You had things that weren't resolved, etc. It's a pretty rod-sweeping doctrine. I would say, from my own standpoint, I appreciate the maritime lawyers that come over here because they, probably because you're frequent flyers and statutes like that open the door so wide, we hear from you a lot, but you always do a good job. And I, from, you know, I live out in the Grant Hill country of Texas. I need all the education you can give me, so . . . All right. I take it, Mr. Swain, you're in the ancestral chain of one Frederick Swain who used to teach at Loyola? Yes, Judge Stewart, I am. It was my father. I remember that case. Well, I had him. I had him. Gee, and I won't tell you what kind of green I got. Well, Judge . . . Any event, I have a feeling that, but it doesn't inure for or against you. It was a curiosity question I just had to, just had to answer. I started having flashbacks. Well, sitting up here, and I'm . . . Judge Stewart's single eye, because I had him for a teacher in the summer, and he was pretty rough. I won't tell you whether it was good or bad. But, anyway, we appreciate the arguments in this case. We don't get a lot of these, so, you know, it's always interesting to get us into some aspects of the law. I live in north Louisiana, to be honest with you. I wasn't necessarily big in Lake Providence. I was big in kind of the upper regions of damageability and water and all that sort of stuff, so I had to pull out kind of . . . I mean, it has nothing to do with the merits. It's just I live in north Louisiana, so I'm looking at the map and the piece and the thing you're going that far up, and I'm like, well, okay. So, anyway, that's just to applaud you lawyers. We do appreciate those of you who do this, so it helps educate us because we don't get a lot of them. So, we'll square it up. We appreciate your briefing, your oral argument in the case. It'll be submitted, and we'll get it decided. That completes the orally argued cases. We had one other one, but regrettably it had to be converted. So, along with the NOA cases, they'll be submitted. Otherwise, the panel will be in recess until 1 p.m. tomorrow. Thank you. Thank you.